UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| REBECCA RODDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SEARS, ROEBUCK & COMPANY, | ) | No. 1:04-CV-187 |
| | ) | |
| Defendant, | ) | Collier / Lee |
| | ) | |

## REPORT AND RECOMMENDATION

This action arises out of damage to Plaintiff Rebecca Roddy's ("Roddy") Chattanooga,

Tennessee residence caused by a fire that allegedly was the result of the negligent installation of an

HVAC unit Plaintiff purchased from Defendant Sears, Roebuck & Company ("Sears") [Complaint,

Doc. No. 1, pt. 3]. Plaintiff filed the action on May 17, 2004 in the Circuit Court of Hamilton

County, Tennessee, and Sears removed it to this Court pursuant to 28 U.S.C. § 1441, asserting the

Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332 [Notice of Removal,

Doc. No. 1, pt. 1]. On September 13, 2004, Sears filed a Third Party Complaint against Bill Wade

d/b/a Superior Enterprises ("Wade") and Grange Mutual Insurance Company ("Grange Mutual")

alleging an entitlement to recover from Wade and Grange Mutual all or part of what Roddy may

recover from Sears [Doc. No. 9, ¶ 2]. On March 9, 2005, Sears filed a notice of voluntary dismissal

as to Wade, pursuant to Fed. R. Civ. P. 41(a)(1) [Doc. No. 22]. On August 23, 2005, the Court

granted Grange Mutual's motion for summary judgment [Doc. No. 16] and dismissed Sears' claims

against Grange Mutual [Doc. No. 45].

Before the Court is a motion for summary judgment pursuant to Fed. R. Civ. P. 56 filed by

Sears [Doc. No. 35] on July 11, 2005. On August 17, 2005, Sears filed an Amended Motion for

Summary Judgment [Doc. No. 43]. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and (c), to issue a report and recommendation regarding the resolution of Sears' motion, as amended [Doc. No. 41, 46]. In preparing this report and recommendation, I considered Sears' supporting brief and exhibits to its motion for summary judgment [Doc. No. 36-1, 36-2], Sears' supplemental submissions [Doc. No. 38], Sears' supporting brief and exhibits to its amended motion [Doc. No. 44-1, 44-2] and Roddy's response and exhibits to Sears' motion [Doc. No. 47-1, 47-2, 47-3, 47-4].[1] For the reasons set forth, below, I **RECOMMEND** the Court **DENY** Sears' motion for a summary judgment, as amended [Doc. No. 35, 43].

I.     STANDARD OF REVIEW

        Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden is on the moving party to conclusively show no genuine issues of material fact exist, *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003), and the Court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is

_____

        [1] Sears also filed an additional supplement to its initial motion for a summary judgment [Doc. No. 37]. Review indicates the documents in this supplement are identical to the exhibits filed with Sears' motion for summary judgment [Doc. No. 36-1, 36-2].

2

entitled to summary judgment. *Id.* at 323.

The Court determines whether sufficient evidence has been presented to make an issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson*, 477 U.S. at 250. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter summary judgment. *Id.*; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II.   <u>RELEVANT FACTS</u>

On or about March 13, 2002, Roddy purchased a new HVAC unit and installation services from Sears. [Doc. No. 1-3, ¶ 3; Doc. No. 47-2, ¶ 2]. Roddy's home, where the HVAC unit was installed, is located at 329 Stringer Street, Chattanooga, Tennessee 37405 [Doc. No. 47-2, ¶ 3]. Roddy paid Sears for the HVAC unit. *Id.* at ¶ 5. The contract for the purchase and installation of the HVAC unit sets forth the following handwritten special instructions:

> Sears Installation
>
> (1) New Kenmore split heat pump
>
> (2) Install new supply ductwork & air handler . . .
>
>   . . . .

3

(5) Electrical hookup start and test system

[Doc. No. 38, Exhibit 1]. The contract provides for the installation of a new duct system and electrical disconnect, but provides the system will be connected to the existing electrical panel/breaker box. *Id.* The contract also provides for a five-year maintenance agreement on the HVAC unit. *Id.* Finally, the contract states:

> ### CUSTOMER AGREES
>
> Sears is not responsible for any existing code violations or pre-existing conditions of any ductwork, piping, electrical supplies or equipment not being replaced at this time. If additional work is required, it will be the customers responsibility. Any additional charges will be quoted and approved prior to the start of additional work _____.
>
> Initial

[Doc. No. 38]. No initials appear on the blank line. *Id.*

Shortly after Roddy purchased the HVAC unit, Sears arranged for the installation of the unit by Wade [Doc. No. 47-2, ¶ 6]. With regard to the installation of the HVAC unit, Wade testified during his May 4, 2005 deposition:

> Q  So in this case, the salesman would have gone to Ms. Roddy's home, looked at the home, made a determination as to what was needed, and filled the form out that was ultimately sent to you?
>
> A  He, he's got three contractors, and he would talk to the homeowner, and he'd look underneath it. And I was told that, that the other companies turned it down because they wanted to try to put it underneath the floor, and they wouldn't do it.
>
> He asked me what I thought about the job. I drove by there. I looked at it. I told him that I would put the job in, but I would not put it in under the floor. The only way I'd put it in is if it went in the attic. And about two weeks later he called me back and said that he sold it in the attic, would I go put it in.

[Doc. No. 47-4, at 202].

4

Wade testified Rick Carroll, the salesman employed by Sears who contacted Wade, knew Wade always subcontracted the electrical portion of any HVAC installation. *Id.* at 176. Wade stated Carroll "... knew I couldn't do the electrical work. He asked me to get someone." *Id.* The electrician who did the work on Roddy's home was Mark Hindman ("Hindman") of Lighthouse Electric. *Id.* at 44. Wade also testified Hindman was a licensed electrical contractor, and it was Hindman who connected the HVAC system to the electric system. *Id.* at 69-70.

Wade testified the HVAC unit had to be wired into the main switch box/breaker box of the home. *Id.* With regard to the circuit breaker box in the Roddy home, Wade testified:

> Someone done it that was not a professional. That's the reason I wasn't touching it. As soon as I looked at it, I said there's no way. There's wires – my son could do a better job wiring one up. They had neutrals going to grounds; grounds going to neutrals. It's a wonder that every light in the house didn't flicker when the light – when something come on and off.
>
>  . . . Someone put a new 200 amp service in a hundred-year-old house. That's all I know. I wasn't touching it. That's the reason I had a licensed electrician do it . . .

*Id.* at 221-22.

Wade testified Sears knew he had to get someone else to do the electrical work, he selected Hindman to do the electrical work, and he paid Hindman more than Sears paid him. *Id.* at 223-225. Wade also testified ". . . I didn't even touch any electrical and . . . Sears had already sent out two or three other crews to do minor work that could have been warranty work." *Id.* at 44.

With regard to his status with Sears, Wade testified he was not a Sears employee [Doc. No. 36-2, at 130]. Wade explained Sears did not take deductions for income tax withholding or social security out of payments to him, and he had the right to control his work, his employees and contractors ". . . to a point, I mean, I've got to uphold Sears' image." *Id.* Wade also testified he was

5

required to comply with the provisions of his contract with Sears, but he was always an independent contractor to Sears. *Id.* at 130-31.

Wade's contract with Sears, in relevant part, provides:

1.   . . . Contractor will accept jobs tendered by Sears . . .for the repair and/or installation of HVAC . . . and the Contractor will perform such repair and/or installation work for each job in a neat and professional manner pursuant to the installation instructions as contained in the current Owner's Manual . . . .

2.   . . . upon receiving a job for a repair and/or installation from Sears, Contractor shall first determine whether the job can be satisfactorily completed before beginning the job . . . .

3.   Contractor will procure and/or stock the material to be supplied by it under this Contract which will meet or exceed the material specifications attached hereto . . . Contractor shall make no purchase or incur any expense or obligation of any kind in the name of Sears. . . .

4.   Contractor guarantees that every job shall be free from defects in Contractor's workmanship for a period of one (1) year after completion. . . .

5.   Sears will issue to Contractor an identification card which identifies Contractor as a "Sears Authorized Contractor," which Contractor and its employees may use to identify themselves to Sears Consumers. Contractor will return to Sears all such identification material upon termination of this agreement and will not thereafter represent itself to the public as a "Sears Authorized Contractor."[2]

6.   Under no Circumstances shall Contractor or its employees represent themselves as Sears employees or agents. The Contractor will NOT use the Sears Authorized Installer designation in telephone directory listings or any other type

---

[2] Wade testified he was never provided with the card identifying him as a "Sears Authorized Contractor" as called for in his contract with Sears [Doc. No. 47-4, at 180]. He stated that when he went to the home of a customer of Sears for the first time, "I didn't have anything other than my personal presence and me stating that I was there for Sears." *Id.*

6

of advertising without the express prior written consent of Sears.

7.      . . . all leads and prospects resulting from Sears work belong to Sears and Contractor agrees to notify Sears of all such prospective customers.  All leads and prospects resulting from Contractor's non-Sears work remain the property of the Contractor.

        . . . .

9.      Contractor has full right to determine, and the responsibility for, the method, manner and control of the work to be performed as specified in the Estimate and Proposal or the General Order to Contractor, and Contractor will employ sufficient competent adult workers to complete each job promptly and satisfactorily.  Contractor has the sole and exclusive right to hire, direct, supervise and discharge any workers employed by Contractor.  If a customer is not satisfied with the workmanship, quality of material or customer is not satisfied with the workmanship, quality of material or progress of the job, Sears, may, as agent for customer, request that Contractor and/or its workers be withdrawn from the job.  Contractor agrees to transfer from the job any employee who is objectionable to Sears of Sears customers for reason of health, safety and/or security of Sears customers (including property), employees or materials and/or whose manner impairs Sears customer relations.

10.     Contractor shall at its own expense procure and keep in force during the terms of this Contract, Comprehensive General Liability Insurance, including Products and Completed Operations Coverage. . . .

        . . . .

12.     Contractor agrees to protect, defend, hold harmless and indemnify Sears, its agents and employees from and against any and all claims, demands, actions, liabilities, losses, costs and expenses (including but not limited to attorney's fees), arising out of any actual or alleged . . . damage to or destruction of any property . . . from any actual or alleged act or omission of the Contractor, in the performance of the work, of any law, statute or state ordinance or any

7

governmental administrative order, rule or regulation.

[Doc. No. 38, Exhibit 2].

Wade testified his payment for the Roddy job, as well as other jobs performed under his contract, came from Sears [Doc. No. 36-2, at 190]. Wade stated Sears did not specify the materials he was supposed to use and stock, and, although Sears required him to use materials that would satisfy the applicable city or county code, he performed all his jobs to the higher TVA standard. *Id.* at 190-91. Wade also stated Sears did dictate the minimum standard, which is

> . . . what you can buy at Home Depot, and you could've used that if you'd wanted to and it would've . . . you can make that pass the Chattanooga if you want to do it right, but I just didn't use it. I used the grade A stuff. There was never a question with that because I always did TVA work.

[Doc. No. 47-4, at 192]. Wade testified the customer would buy the HVAC unit and the thermostat from Sears and he would supply the rest of the materials for the installation. *Id.* at 205. Wade also testified he would be responsible for the design and layout of the ductwork, except where the homeowner had specific add-ons they wanted to use. *Id.*

Wade testified Sears would occasionally do a follow-up inspection of the work he had performed [Doc. No. 47-4, at177-78]. He stated the purpose of the inspection was to see if Wade had stayed within certain standards; namely:

> If you went in a house and it's a million dollar house, you've got to pretty much do a million dollar looking job . . . High-dollar house, medium size house. You know, you can't go in there and put high-dollar trim in a house that's got 50 cent trim in it. You have to fix it back as, as you took it apart . . . And that's the standard of putting a job in right and it matching what – the house that you're working on.

*Id.* Wade stated in those situations where Sears did not do an on-site inspection of his completed work, it would do a "call back" to the homeowner to see if there were any problems. *Id.* at 179.

8

Wade stated he would occasionally get a report of the "call back." *Id.* at 179. Based upon the reports he received, Wade's impression was most jobs got a "call back" instead of an on-site inspection. *Id.*

Roddy's home was substantially damaged by a fire on May 21, 2003 [Doc. No. 47-2]. Her complaint alleges the fire was caused by the negligent installation of the HVAC unit by Sears or the negligent failure of Sears to detect, correct or remedy the electrical problems and/or negligent installation during subsequent service calls on the HVAC unit. [Doc. No. 1-3, ¶6]. In the alternative, Roddy alleges Sears is liable for breach of contract. *Id.* at ¶ 9. Roddy seeks the following damages: increased electrical bills between the installation and the fire; repair and replacement of the structure; additional living expenses incurred due to the fire; loss and destruction of contents of her home; cost of the HVAC unit; lost time from work; and suffering, inconvenience, and emotional strain. *Id.* at ¶ 7.

Attached to Sears' amended motion for summary judgment is the affidavit and resume of Thomas E. Eaton ("Eaton"), PE, ScD, who examined Roddy's home on June 11, 2003, in order to determine the cause of the May 21, 2003 fire [Doc. No. 44-2, Exhibit 4, Exhibit A]. Eaton's affidavit states in pertinent part:

> 6. No problem was indicated with the outdoor unit; it had not caused the fire and had not been involved in the fire.
>
> 7. The fire destroyed the indoor unit. However, the indoor heat pump unit was not in the area of the origin of the fire, and there was no physical evidence at the scene to indicate that the indoor unit had been involved in causing the fire.
>
>      . . . .
>
> 9. Two electrical cables had been connected inside the main electric panel box when the HVAC system was installed.

These cables were routed through the origin area along with numerous older branch, electrical cables for light and receptacle circuits. One HVAC cable went to the attic air handler; the other cable went to the outdoor unit. The indoor unit cable was connected to a square-D, QO, 50 amp breaker that was found tripped after the fire. The outdoor heat pump was connected to a square-D, QO, 30 amp breaker that was also found tripped after the fire.

10. Both electric cables installed by the Sears contractor to supply power to the heat pump units were examined at the fire scene. Neither electrical cable installed during the Sears HVAC equipment installation had evidence of any kind of electrical failure or arcing.

11. The Roddy residence had a 200-amp, square-D, QO, main circuit breaker panel box. This main panel box had been installed prior to the fire as part of an electric, service entrance upgrade. However, the existing, non-metallic clad-type NM (Romex)-electric cables used in the building electrical system were reconnected to the new panel box. Two, old electric cables routed out the top, left of the main panel box, were found separated by severe electrical shorts near the top of the panel box. Both of these light and receptacle circuit cables had an undersized ground and conductor that indicated an installation date around 1960-1965.

12. From a general inspection of the building wiring, the main electric panel box, and the fire damages in the origin area, it was determined that the fire did originate near the top of the main electric panel in the immediate vicinity of the two shorted, light and receptacle circuit cables . . . .

 . . . .

14. . . . the probable cause of the fire was a short involving an old-style electric cable for the light and receptacle circuits. The short occurred near the top, left of the main panel box. The electrical cables for the indoor and outdoor heat pump units did not cause the fire. Also, there was no evidence to indicate that the fire had been caused by either the indoor or the outdoor heat pump units.

15. It is this engineer's opinion that the fire at the Rebecca Roddy residence was not caused by failure involving either electrical cable installed when the Sears HVAC system was installed.

[Doc. No. 44-2, Exhibit 4].

Attached to Roddy's response to Sears' amended motion is the affidavit of Rex Adcock ("Adcock") [Doc. No. 47-3]. Adcock is a journeyman electrician with thirty years experience who is familiar with the building and electrical code requirements for both Hamilton County and the State of Tennessee. *Id.* at ¶ 2. On or about May 22, 2003, Adcock inspected the electrical outlet panel and wiring in the Roddy home at the request of Roddy and her husband. *Id.* at ¶3. Adcock's affidavit states in pertinent part:

5. Based upon my inspection of the Roddy home, my training, experience, and discussions with Mr. and Mrs. Roddy pertaining to relevant history concerning electrical problems in their home, I was able to determine that the circuit panel for the Roddy home was insufficient (without installing a larger circuit panel) to supply the additional 50 amp demanded by the HVAC unit.

6. I observed electrical code violations relating to the connection of the HVAC unit in the Roddy home as follows:

    a. No connectors in the units – gromets missing
    b. No connectors in the panel
    c. Improper wire size for the breaker – 30 amp wire was installed on a 50 amp breaker
    d. Improper load calculation.

In my opinion, the installation of the HVAC unit in the Roddy home without correcting these code violations is below the standard of care for a reasonably prudent electrician.

7. In my opinion, the improper load calculation, use of the improper wire size for the HVAC breaker and overloading of

the circuit panel by addition of the HVAC unit in the Roddy home caused the fire in the circuit panel.

8. The installation of the HVAC unit without upgrading the circuit panel to handle the additional load required by the added appliance (thus overloading the panel) was below the standard of care for a reasonably prudent electrician.

[Doc. No. 47-3]. Neither party has challenged the qualifications of Eaton or Adcock to give an expert opinion.

Finally, the affidavits of Randy Bailey ("Bailey") and Keith Brock ("Brock") are attached to Sears' original motion for summary judgment [Doc. No. 36-2, Exhibit 2; Doc. No. 36-3, Exhibit 3]. Bailey and Brock performed work at the Roddy home on the HVAC unit subsequent to its installation, but prior to the fire [Doc. No. 36-2, Exhibit 2, ¶ 3; Doc. No. 36-2, Exhibit 3, ¶ 4]. The second and fourth paragraphs of the Bailey and Brock affidavits, which are identical, state:

2. I am an independent contractor with respect to my relationship with Sears. Once I am contacted by Sears to perform a particular job, I then control how the work is performed. Sears does not take taxes out on my behalf, but, rather, sends me a 1099 form to be filed with my taxes. I am paid for each job individually that is performed for Sears. I have the right to select and hire helpers of my own and furnish my own tools and equipment for each job. I schedule my own work hours and have the freedom to offer my services to other entities or companies if I so choose.

. . . .

4. At all times during my work at the Roddy home, I was an independent contractor with respect to my relationship with Defendant Sears, Roebuck & Co.

[Doc. No. 36-2, Exhibit 2, ¶¶ 2, 4; Doc. No. 36-2, Exhibit 3, ¶¶ 2, 4].[3]

---

[3] The Eaton affidavit also states: "Mr. Jesse Roddy told me there had been numerous service calls regarding the heat pump system since it was installed. However, no association was indicated

## III. **DISCUSSION**

Sears seeks summary judgment on Roddy's claims of breach of contract and negligent installation of the HVAC unit at the Roddy home [Doc. No. 35, 43]. Sears contends that it cannot be held liable for either breach of contract or negligent installation because the contract for the installation of the HVAC unit at the Roddy home was successfully performed, and because the persons who installed and repaired the unit were independent contractors. *Id.* Specifically, Sears asserts: 1) Wade and the other individuals who either installed or performed work on the HVAC unit at the Roddy home were independent contractors with respect to Sears under Tennessee law, and Sears cannot be held liable for the negligence, if any, of such independent contractors; and 2) the contract required only installation of the HVAC unit in the Roddy home, and since such installation was successfully completed Sears cannot be held liable for breach of contract [Doc. No. 36-1, at 3-7].

In its amended motion, Sears makes the same allegations set forth above and also asserts it cannot be held liable because the undisputed material facts show there is no causal link between the fire at the Roddy home more than a year after the installation of the HVAC unit and "the work of any representative of . . . Sears" [Doc. No. 43].

In her response to Sears' amended motion, Roddy asserts Sears is liable for the negligence of the person who installed the HVAC system at her home and is liable for breach of contract [Doc. No. 47-1, at 3-12]. More specifically, Roddy asserts her contract with Sears is broader than the mere installation of the HVAC unit; namely, she asserts her contract with Sears includes implied

---

between the cause of the fire and the heat pump system problems reported by Mr. Jesse Roddy." [Doc. No. 44-2, Exhibit 4, ¶ 8].

warranties that the HVAC installation would be performed in a workmanlike fashion, the work would be free of defects, and the work would be performed according to code requirements. *Id.*

Because this court's jurisdiction over this action is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332, this court must apply the substantive law of the State of Tennessee, the State in which this court is situated, to Roddy's claims. *Erie Railroad v. Tompkins*, 304 U.S. 64, (1938).

**(1)     Roddy's negligence claim**

Sears asserts it cannot be held liable for the negligence, if any, of Wade and Hindman in installing the HVAC unit in Roddy's home because Wade and Hindman were independent contractors and there was no causal connection between the HVAC unit and the fire at Roddy's home [Doc. Nos. 35, 43]. Under Tennessee law, to establish a cause of action for negligence, Roddy must prove: (1) a duty of care owed by Sears to her; (2) conduct by Sears falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal causation. *Wilson v. Thompson Const. Co.*, 86 S.W.3d 536, 539 (Tenn. Ct. App. 2001)(citing *McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn. 1991)).

**(a)     Independent contractor**

Under the doctrine of *respondeat superior*, a principal may be held liable for the negligent acts of its agents. *Tucker v. Sierra Builders*, No. M200302372COAR3CV, 2005 WL 1021675, *8 (Tenn. Ct. App. Apr. 29. 2005) (citing *Johnson v. LeBonheur Children's Med. Ctr.*, 74 S.W.3d 338, 346 (Tenn. 2002)).  In order to hold a principal liable for the acts of another, a plaintiff must prove (1) the person causing the injury was the principal's agent and (2) the person causing the injury was acting on the principal's business and acting within the scope of his employment when the injury

14

occurred. *Tucker*, 2005 WL 1021675 at *8 (citing *Russell v. City of Memphis*, 106 S.W.3d 655, 657

(Tenn. Ct. App. 2002)). It is well established under Tennessee law "that an employer or general

contractor is not ordinarily liable for the negligence of an independent contractor." *Wilson*, 86

S.W.3d at 541 (citing *Potter v. Tucker*, 688 S.W.2d 833 (Tenn. Ct. App. 1985); *International

Harvester Co. v. Sartain*, 222 S.W.2d 854 (1948)).

The Tennessee Supreme Court has set forth the following factors for determining whether

an individual is an agent or an independent contractor:

> (1) the right to control the conduct of the work; (2) the right of
> termination; (3) the method of payment; (4) the freedom to select and
> hire helpers; (5) the furnishing of tools and equipment, (6) the self-
> scheduling of work hours, and (7) the freedom to render services to
> other entities.

*Tucker*, 2005 WL 1021675 at *8 (citing *Beare Co. v. State*, 814 S.W.2d 715, 781 (Tenn. 1991)). No

one of the factors is determinative, but the importance of the right to control has been emphasized,

"the relevant inquiry being whether the right existed, not whether it was exercised." *Galloway v.

Memphis Drum Serv.*, 822 S.W.2d 584, 586 (Tenn. 1991). More specifically,

> The primary test is whether the alleged employer maintains a right of
> control over the *method* of work, which indicates an employer-
> employee relationship. . . . Mere control over the *results* of the work
> indicates an independent contractor status.

*Henley v. Tom Moore Realtors, Inc*, No. 01-A-01-9010-CV 00383, 1991 WL 66506, *1 (Tenn. Ct.

App. May 1, 1991)(citing *Stiz v. Bryant*, 201 S.W.2d 985 (Tenn. 1947)) (emphasis in original).

With regard to the issue of control, the court in *Sodexho Management, Inc. v. Johnson*, No.

M2003-00660-COA-R3CV, 2004 WL 2533821 (Tenn. Ct. App. Nov. 8, 2004) stated:

> The employer may exercise a limited control over the work without
> rendering the employee a mere servant, for the relation of master and
> servant is not inferable from the reservation of powers which do not

15

> deprive the contractor of his right to do the work according to his own initiative so long as he does it in accordance with the contract. The control of the work reserved in the employer which makes the employee a mere servant is a control, not only of the result of the work, but also the means and the manner of the performance thereof; where the employee represents the will of the employer as to the result of the work but not as to the means or manner of accomplishment, he is an independent contractor. Thus, a person employed to perform certain work is not necessarily a mere servant because the contract provides that the work shall be subject to the approval or satisfaction of the employer. Such a provision is not an assumption by the employer of the right to control the employee as to the details or methods of doing the work, but is only that the employer may see that the contract is carried out according to the plans.

*Id.* at *3 (quoting *Odom v. Sanford & Treadway*, 299 S.W. 1045, 1046 (Tenn. 1927)).

The mere placement of terms such as "agent" or "independent contractor" in a contract is not determinative. *Henley*, 1991 WL 66506 at *1. Whether the relationship of agent or independent contractor "exists at all must be determined by the facts and circumstances of each case, and the intentions of the parties are not controlling." *Id.* (citing *Franklin Dist. Co. v. Crush International (U.S.A.), Inc.*, 726 S.W.2d 926 (Tenn. Ct. App. 1986); *Rick Printing Co. v. McKeller's Estate*, 330 S.W.2d 361 (1959)). Lastly, "once it is established that an employment relationship exits, the burden is on the employer to prove that the worker [i]s an independent contractor rather than an employee." *Galloway*, 822 S.W.2d at 586.

Based upon the evidence presented, there is no genuine issue of material fact and Sears has shown that Wade was an independent contractor as a matter of law. Although Sears did retain some control in the result, Sears did not retain control in the method of the installation of the HVAC unit. Once Sears contacted Wade and told him which HVAC unit and thermostat Roddy had purchased, Wade controlled the installation of the HVAC unit. Sears contacted Wade to see if he would

16

perform the installation only after other installers had declined to do so, and Wade too could have declined the job. Wade went to the Roddy's home and then told Sears he would not install the indoor HVAC unit under the floor as requested, but he would install the indoor unit in the attic of the home [Doc. No. 47-4, at 202]. Sometime later, Sears telephoned Wade and told him they had sold the HVAC unit with the installation to be in the attic. *Id.* Sears was aware Wade did not perform the electrical portion of the HVAC installation, and it was Wade who hired and paid Hindman to perform the electrical portion of the installation. *Id.* at 44, 69, 176, 223-25. Furthermore, Sears did not specify the material Wade was to use to perform the installation, *id.* at 190-91; and Wade performed the installation of the HVAC unit to the TVA standard, a higher standard than the minimum Sears required. *Id.* at 191-92. Finally, Wade was responsible for the layout and the design of the ductwork. *Id.* Given these undisputed facts, I conclude Wade was an independent contractor for Sears with respect to the HVAC installation.

### (b)  Exception to the independent contractor principle

Roddy asserts that even if Wade was an independent contractor, this case falls into a recognized exception to the independent contractor principle under Tennessee law. Exceptions to the independent contractor principle were discussed in *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42 (Tenn. Ct. App. 2004), which involved an action filed by an automobile dealer because the dealer's vehicles were damaged when the adjacent church hired a painter whose work resulted in vehicles being covered with fine droplets of paint. The court explained:

> Tennessee, like many jurisdictions, recognizes the principle that the employer of an independent contractor is not automatically liable for physical harm caused to another by the contractor's negligence. *McHarge v. M.M. Newcomer & Co.*, 117 Tenn. 595, 604, 100 S.W. 700, 702 (1907); *Wilson v. Thompson Constr. Co.*, 86 S.W.3d 536, 541 (Tenn. Ct. App. 2001); *Restatement (Second) of Torts* § 409

17

(1965). The scope of this principle's application has been narrowed dramatically over the years by the recognition of numerous exceptions. *Givens v. Mullikin*, 75 S.W.3d 383, 394 (Tenn. 2002) (noting that the principle has many exceptions); *see also Restatement (Second) of Torts*, §§ 410-429; W. Page Keeton, *et al.*, *Prosser and Keeton on the Law of Torts* § 71, at 509-516 (5th ed. 1984). Indeed, it has been said that the principle is now so riddled with exceptions that it is only applied when the courts cannot find a good reason to ignore it. *Restatement (Second) of Torts*, § 409 cmt. b.

*Id.* at 53.

Roddy focuses her argument on the exception found at *Restatement (Second) of Torts* § 429, which states:

> § 429. Negligence In Doing Work Which Is Accepted in Reliance On the Employer's Doing the Work Himself
>
> **One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.**

Section 429 of the *Restatement (Second) of Torts* refers to "physical harm." In her complaint, Roddy has sought compensation for property damage and damages for suffering and emotional strain [Doc. No. 1-3, Complaint, ¶ 7]. Although the *Waggoner* court did not discuss § 429

18

of the *Restatement (Second) of Torts,* it did find that the exceptions set forth in §§ 414[4] and 427[5] of

the *Restatement (Second) of Torts*, which also use the term "physical harm," applied to the property

damage situation in *Waggoner*. Like in *Waggoner*, where the phrase "physical harm" was not

restricted to only physical injury or bodily injury, I conclude § 429 of the *Restatement (Second) of*

*Torts* could apply here.

 In support of her argument, Roddy's affidavit states in pertinent part:

> 5. I paid Sears for the HVAC unit.
>
>  . . . .
>
> 7. The HVAC unit which I purchased from Sears was delivered by Bill Wade who I believed to be from Sears.
>
>  . . . .
>
> 9. I was not aware that Bill Wade was not an employee or representative of Sears until after Sears filed their answer to the complaint in this cause.
>
>  . . . .

---

[4] *Restatement (Second) of Torts* § 414 provides:
> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

[5] *Restatement (Second) of Torts* § 427 provides:
> One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

11. On at least 11 to 12 occasions over a period of the next year, beginning almost immediately after the HVAC unit was installed in my home, I called Sears and requested that they return to my home to address recurring problems with the HVAC.

12. Every time I called Sears to request repair or service relating to the electrical problems, Sears sent a repair person to my home to attempt to resolve the problems.

[Doc. No. 47-2].

Roddy's contract with Sears provides for "Sears Installation" [Doc. No. 38, Exhibit 1]. Nowhere in the contract does it state the installation is to be done by an independent contractor and not a Sears' employee. The HVAC Job Start-Up and Completion Form does not disclose Wade was an independent contractor [Doc. No. 38, Exhibit 3]. Sears has not presented any document disclosing to Roddy that the installation was to be performed by an independent contractor. Although Wade's contract with Sears stated Sears would furnish him with an ID card stating he was a "Sears Authorized Contractor" [Doc. No. 38, Exhibit 2, ¶ 5], he had no such card. When Wade went to the home of a Sears customer for the first time, he would simply state he was there "for Sears" [Doc. No. 47-4, at 180]. Thus, viewing the facts in the light most favorable to Roddy, I conclude there is a genuine issue of material fact as to whether Sears may be held liable for any negligence of its independent contractors.

### (c)    Lack of a causal connection

Sears also asserts it is entitled to summary judgment on Roddy's claims of negligence because, even assuming *arguedo* Wade and Hindman were negligent in installing the HVAC unit, the evidence unequivocally shows that such negligence was not the cause of the fire in the Roddy home. Contrary to Sears' contentions, however, I conclude the Adcock affidavit is sufficient to

20

create a genuine issue of material fact as to whether the electrical installation of the HVAC unit was negligently performed and whether such negligence was related to or caused the fire at the Roddy home.

Accordingly, I **RECOMMEND** Sears' motion for summary judgment on Roddy's claims of negligence be **DENIED**.

### (2) Roddy's breach of contract claim

Sears asserts its contract with Roddy required only that the HVAC unit be installed, and it is entitled to a summary judgment on Roddy's breach of contract claims because its contract with Roddy has been performed [Doc. No. 35, 43]. Sears relies on the HVAC Job Start-Up and Completion Form which states: "NOTICE to CUSTOMER: Do not sign this Statement until the Installation is satisfactorily completed. To Sears, Roebuck and Co.: The installation of the above merchandise ordered by me has been satisfactorily completed." [Doc. No. 38, Exhibit 3]. Wade's signature and the date appear clearly on the form. It is impossible to tell whether Roddy signed the form filed with the court, *id.*, although Wade testified Roddy did sign the form in his presence and the form is unreadable because it is the second copy of a triplicate form [Doc. No. 36-2, at 122-23].

Even assuming Roddy did sign the certification of completion, a genuine issue of material fact exists which precludes summary judgment in favor of Sears on Roddy's contract claims. Sears contends its contract with Roddy provides only for the installation of the HVAC unit. Although the contract explicitly provided for "Sears Installation"[Doc. No. 38, Exhibit 1][6], Tennessee law recognizes that such a contract also includes an implied warranty that the HVAC unit would be installed in a workmanlike manner and would be free of defects. *See Davis Heating & Air*

---

[6] The contract also states the contract price includes a 5 year maintenance agreement [Doc. No. 38, Exhibit 1]. No evidence as to the terms of any maintenance agreement appears in the record.

*Conditioning, Inc. v. Exline*, No. CA 121, 1990 WL 74397, *2 (Tenn. Ct. App. 1990). The affidavit of Adcock is sufficient to create a genuine issue of material fact as to whether the installation of the HVAC unit was performed in a workmanlike manner, was free of defects, met the applicable standards, and satisfied the applicable codes.

Accordingly, I **RECOMMEND** Sears' motion for summary judgment on Roddy's breach of contract claim be **DENIED**.

## IV.    CONCLUSION

For the reasons stated above, I **RECOMMEND** the Court **DENY** Sears' motion for summary judgment, as amended [Doc. No. 35, 43].[7]


s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[7] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide de novo review where objections to this Report and Recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).